UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

JOHN DAVID WALSH, et al.

        Plaintiffs,                                Case No. 19-11958
vs.                                                    HON. MARK A. GOLDSMITH

STEPHEN RUPKUS, et al.,

        Defendants.

_____/

**OPINION & ORDER**
**GRANTING IN PART DEFENDANTS STEPHEN RUPKUS AND CLINTON TOWNSHIP'S MOTION FOR SUMMARY JUDGMENT (Dkt. 31)**

Plaintiffs John Walsh and Stacy Pegg have brought a range of claims against Defendants Clinton Township Detective Stephen Rupkus and Clinton Township. The claims arise out of an investigation Rupkus conducted into a conflict between Plaintiffs and two fellow patrons of a bar in 2016. The investigation led to criminal charges being brought against Plaintiffs, all of which were either dismissed or resulted in acquittal. Defendants have moved for summary judgment (Dkt. 31).

The motion is granted in part. Plaintiffs stipulated to the dismissal of the claims against Clinton Township (Count II), all of which are dismissed with prejudice. They also stipulated to the dismissal of a malicious prosecution claim brought against Rupkus pursuant to Michigan Compiled Laws § 600.2907 (Count III), which is also dismissed with prejudice. Rupkus is awarded summary judgment with respect to the claims brought against him under the United States Constitution (Count I). Of the three claims brought within that count, one (malicious prosecution under the Fourteenth Amendment) fails because Plaintiffs cannot establish one of the elements of the claim, i.e., that Rupkus made, influenced, or participated in the decision to prosecute by

knowingly or recklessly including material false information in his police report. The other two claims—for malicious prosecution under the Fifth Amendment and a violation of substantive due process under the Fourteenth Amendment—fail because they are not cognizable. The remaining state law claims (Counts IV and V) are dismissed without prejudice pursuant to 28 U.S.C. § 1367(c)(3).

## I.    BACKGROUND

At approximately 2:45 a.m. on September 30, 2016, Clinton Township police officers Wietecha and Deneweth were dispatched to the South River Bar in reference to reports of an assault. Wietecha Field Report at PageID.28 (Dkt. 1). Wietecha prepared a field case report, identifying Walsh and Pegg as victims; Candy Witherow, James Murphy, and Kelly Cahill as persons interviewed; and Virginia Schneider and James Eddy as witnesses. Id. at PageID.24–28. Wietecha spoke with Walsh, Pegg, Schneider, and Eddy. Id. at PageID.28–29. Walsh told Wietecha that an unknown male in a white pickup truck, with "Michigan Roofing" written on the side, ran him over. Id.

According to Walsh's testimony at his criminal trial, an argument had occurred earlier in the bar's patio area, and involved Walsh's brother Tom Walsh, a friend of Tom's, that friend's wife, Murphy, and Cahill. Walsh Trial Tr. at 18–20 (Dkt. 36-3). John Walsh said that he and Pegg were inside the bar when the argument began on the patio. Id. at 20. Tom, his friend, Murphy, and Cahill walked into the bar from the patio; some people from the group that had been on the patio "were yelling and screaming"; and Schneider turned on the lights and told everyone they had to leave. Id.

According to Walsh, Murphy used his vehicle to block Walsh's vehicle from exiting the parking lot. Id. at 26. Walsh said that he approached Murphy to tell him to go home and have a

good night. Id. He said that he had nothing to do with Murphy's problems and did not know why Murphy was blocking him in. Then, as he testified, "I extended my hand to say hey, have a good night, and the next thing I know, I was on the ride for my life." Id. at 26. According to Walsh, Murphy grabbed his arm and began driving through the parking lot. Id. at 26–27. Pegg grabbed Walsh's other arm, "and next thing you know, we were both being dragged." Id. Walsh said that he heard Cahill tell Murphy, "It's not him, let him go now." Id.

Walsh and Pegg gave a similar—but not identical—report of the night's event to Wietecha. Wietecha Field Report at PageID.28. Walsh stated that after being dragged through the parking lot, he "broke free from the truck and rolled through the lot as the truck drove off . . . ." Id. Pegg's statement to Wietecha differs from Walsh's testimony in that Pegg reported being grabbed by someone in the truck and dragged through the parking lot before breaking free herself, as opposed to being dragged because she tried to grab hold of Walsh. Id.

After interviewing Walsh and Pegg, Wietecha went into the bar and spoke with Schneider. Id. at PageID.29. Schneider, who was working at the bar that night, stated that she had observed part of the altercation outside. Id. She said that Pegg and Walsh had had an argument with an unknown male who she believed was named Mike. Schneider reported observing Walsh and Pegg charging at the white truck with "Mike" inside the truck. Wietecha wrote, "At this time Stacy was seen swinging a small bat at the driver of the truck." Id. Schneider described the white truck driver's flight "as an attempt to get out of the fight, while John held [onto] the door dragging himself through the lot," until he fell off. Id. She opined that Pegg and Walsh had been the aggressors. Id.

Wietecha also interviewed Eddy, who said he had observed the altercation as he pulled up to pick Schneider up from work. He reported observing Pegg and Walsh chasing after a white

3

male in a pickup truck, Pegg holding and swinging a small bat, and Walsh grabbing onto the truck. Id. He said he did not know the man driving the truck but believed his name was Mike. Id.

Rupkus began investigating the case the next morning, as captured in his supplemental report. See Case Supplement Report at PageID.39 (Dkt. 1). In that report, Rupkus states that he spoke with Pegg, Murphy, Cahill, Schneider, bar owner Candy Witherow, and a bar employee named Barb. Concerning the conversation with Murphy and Cahill, the report states:

> We spoke to Murphy and Cahill who stated that they were in an altercation at the listed address with Pegg and her boyfriend Walsh. Murphy and Cahill stated that Walsh and Pegg were the aggressors and they started the fight. Murphy stated that Walsh struck him with an aluminum baseball bat striking him just above his left eye. While talking to Murphy I observed said injury to his forehead. . . .

Id.

The report also states that Walsh denied that there was a baseball bat involved and stated that the suspect James just ran him over. Id. It further states that Schneider told Rupkus that Walsh had held onto the truck door with both hands and that Pegg swung a small bat at the truck's driver. According to the report, Schneider also said that she observed Walsh strike Murphy's head with the bat, that she knew all parties as customers, and that she could identify all four parties. Id. Eddy again reported that he observed Pegg and Walsh chasing after a white male in a pickup truck, that a white female (Pegg) was holding a small bat and swinging it at the driver, and that Walsh grabbed the vehicle and was dragged through the lot. Id.

Warrants for Walsh and Pegg's arrest were issued on October 28, 2016. See Walsh Warrant at PageID.42 (Dkt. 1); Peg Warrant at PageID.44 (Dkt. 1). Walsh and Pegg were each charged with two counts: one for assault with a dangerous weapon, and one for false report of a felony.

At a preliminary examination held March 6, 2017, Judge Carrie Lynn Fuca of the 41B Judicial District (Macomb County) found that there was no probable cause as to the false report

charges, and those charges were dismissed. 3/6/17 Preliminary Examination Tr. at PageID.526–529 (Dkt. 36-19). The court did find probable cause as to the assault charges. Id. The assault charges were brought to trial, and Walsh and Pegg were found not guilty. See 8/9/17 Hr'g Disposition at PageID.46 (Dkt. 1).

## II. SUMMARY JUDGMENT STANDARD

A motion for summary judgment under Federal Rule of Civil Procedure 56 shall be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A genuine dispute of material fact exists when there are "disputes over facts that might affect the outcome of the suit under the governing law." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). "[F]acts must be viewed in the light most favorable to the nonmoving party only if there is a 'genuine' dispute as to those facts." Scott v. Harris, 550 U.S. 372, 380 (2007). "Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial." Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986).

Once the movant satisfies its initial burden of demonstrating the absence of any genuine issue of material fact, the burden shifts to the nonmoving party to set forth specific facts showing a triable issue of material fact. Scott, 550 U.S. at 380; Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). The nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts," Scott, 550 U.S. at 380 (quoting Matsushita, 475 U.S. at 586), as the "mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment," id. (quoting Anderson, 477 U.S. at 247–248) (emphasis in original); see also Babcock & Wilcox Co. v. Cormetech, Inc., 848 F.3d 754, 758 (6th

5

Cir. 2017) ("A mere scintilla of evidence or some metaphysical doubt as to a material fact is insufficient to forestall summary judgment.").

## III. ANALYSIS

Defendants have moved for summary judgment regarding all claims brought by Plaintiffs. The Court first disposes of several claims that have been dismissed by stipulation and two claims—malicious prosecution rooted in the Due Process Clauses of the Fifth and Fourteenth Amendments—which can be addressed in short order. Next, the Court turns to the heart of the dispute, a malicious prosecution claim under the Fourth Amendment. Defendants are entitled to summary judgment on that claim because Plaintiffs cannot meet an element of the claim: that Rupkus made, influenced, or participated in the decision to prosecute by knowingly or recklessly providing material false information to prosecutors. Finally, the Court dismisses the remaining state law claims without prejudice.

### A. Claims Dismissed By Stipulation

Plaintiffs have stipulated to the dismissal of claims against Clinton Township for malicious prosecution under the Fourth, Fifth, and Fourteenth Amendments. Resp. at 20 (Dkt. 36). They have also stipulated to the dismissal of the malicious prosecution claim against Rupkus pursuant to Michigan Compiled Laws § 600.2907. Accordingly, those claims are dismissed.

### B. Fifth Amendment Due Process Claim

Rupkus argues that Plaintiffs' Fifth Amendment due process claim fails because the Fifth Amendment's due process guarantee applies to federal, not state officials. Mot. at 4–5 (citing Palmer v. Schuette, 768 F. App'x 422, 426–427 (6th Cir. 2019)). Plaintiffs acknowledge the state of the current law, but argue that Hurtado v. People of the State of California, 110 U.S. 516 (1884), the supposed basis for the current law, should be overturned. Resp. at 8–9. Plaintiffs are welcome

6

to advance such a claim on appeal, but this Court cannot ignore definitive Supreme Court and Sixth Circuit decisions. Rupkus is granted summary judgment on Plaintiffs' Fifth Amendment due process claim.

### C. Fourteenth Amendment Substantive Due Process Claim

Plaintiffs have also brought a Fourteenth Amendment due process claim against Rupkus for malicious prosecution. Compl. ¶ 47–48. As Defendants argue, "[w]here a particular Amendment provides an explicit textual source of constitutional protection against a particular sort of government behavior, that Amendment, not the more generalized notion of substantive due process, must be the guide for analyzing these claims." Albright v. Oliver, 510 U.S. 266, 273 (1994) (Rehnquist, C.J.) (plurality opinion) (punctuation modified, citation omitted). That opinion specifically refused "to recognize a substantive right under the Due Process Clause of the Fourteenth Amendment to be free from criminal prosecution except upon probable cause." Id. at 268. Following Albright, the Sixth Circuit recognized the Fourth Amendment as the appropriate foundation of a malicious prosecution claim. See Sykes v. Anderson, 625 F.3d 294, 308–309 (6th Cir. 2010); King v. Harwood, 852 F.3d 568, 580 n.4 (explaining this history). Plaintiffs have, appropriately, brought a Fourth Amendment malicious prosecution claim, addressed below. But Plaintiffs' malicious prosecution claim based on a deprivation of substantive due process under the Fourteenth Amendment is not cognizable. Therefore, Rupkus is entitled to summary judgment.[1]

---

[1] Plaintiffs do not explain why the malicious prosecution claim available to them is insufficient for their task. Instead, they cite a case recognizing a Fourteenth Amendment substantive due process claim available against police officers who suppress exculpatory evidence. See Elkins v. Summit Cnty., Ohio, 615 F.3d 671, 676 (6th Cir. 2010). To the extent their claim is for suppression of evidence rather than malicious prosecution, it is outside the scope of the complaint, which placed the Fourteenth Amendment claim under the heading of malicious prosecution. A district court need not consider an argument raised for this first time in response to a motion for summary

### D. Malicious Prosecution

Rupkus has moved for, and is entitled to, summary judgment on the remaining federal malicious prosecution claim.

To establish a Fourth Amendment claim for malicious prosecution, a plaintiff must prove four elements: (i) that a criminal prosecution was initiated against him, and that the defendants made, influenced, or participated in the decision to prosecute; (ii) that there was a lack of probable cause to support the prosecution; (iii) that the plaintiff suffered a deprivation of liberty as a consequence of the legal proceeding; and (iv) that the legal proceeding was resolved in the plaintiff's favor. Sykes, 625 F.3d at 308–309.

Rupkus is entitled to summary judgment because there is no question of fact that he did not make, influence, or participate in the decision to prosecute within the meaning of Sykes.

Plaintiffs attempt to prove that Rupkus made, influenced, or participated in the decision to prosecute them by showing that he knowingly or recklessly made false statements that were material to the prosecution either in reports or in affidavits to secure warrants. See Resp. at 11 (citing Webb v. United States, 789 F.3d 647, 660 (6th Cir. 2015)). Rupkus appears to agree that this is a viable method for proving the first Sykes element. Mot. at 7. He cites Gregory v. City of Louisville, which held that for a plaintiff to prove that two officers unreasonably continued the plaintiff's detention, the plaintiff had to show "that the officers (1) stated a deliberate falsehood or showed reckless disregard for the truth and (2) that the allegedly false or omitted information was material to the finding of probable cause." 444 F.3d 725, 758 (6th Cir. 2006); see also Sykes, 625 F.3d at 313 (citing Gregory, 444 F.3d at 312).

---

judgment. Tucker v. Union of Needletrades, Indus. & Textile Emps., 407 F.3d 784, 788 (6th Cir. 2005).

Plaintiffs present two arguments regarding material false statements in Rupkus's report. The first argument, that Murphy identified Plaintiffs by name when in actuality he referred only to generic assailants, is immaterial. The second argument—that the report contains irreconcilable narratives concerning the use of a baseball bat and Schneider and Eddy's ability to identify the parties involved in the fight—fails to identify a knowingly or recklessly false statement by Rupkus.

### 1. Rupkus's misrepresentation that Murphy and Cahill referred to Plaintiffs as opposed to generic assailants was immaterial.

Plaintiffs identify one demonstrable falsehood in Rupkus's case supplement report. In the report, he stated that Murphy and Cahill told him that they were in an altercation with Pegg and Walsh, that Pegg and Walsh were the aggressors, and that Walsh struck Murphy with a baseball bat. See Case Supplement Report at PageID.39. However, Murphy testified that he did not provide Rupkus with Plaintiffs' names, because he did not know them. Murphy Dep. at 50 (Dkt. 36-18). He also said that he was not sure if he had provided a description, but that he "didn't have a very good description if [he] did." Id. Rupkus confirmed at his deposition that Murphy and Cahill had not identified Plaintiffs by name, description, or what they were wearing before Rupkus wrote his report. Rupkus Dep. at 69–70 (Dkt. 36-17).[2] Finally, Murphy's victim statement, signed October 4, 2016, referred only to generic assailants (Dkt. 36-8).

This evidence shows that Rupkus may well have been negligent in writing that Murphy and Cahill had referred to Plaintiffs by name, when in actuality they had referred only to unknown,

---

[2] Plaintiffs have not submitted similar testimony or an affidavit from Cahill; instead, they rely solely on Rupkus's statement that neither Cahill nor Murphy identified Plaintiffs. It is not entirely clear from Plaintiffs' briefing whether they argue that Rupkus misrepresented Cahill's statement to the police. To the extent they make such an argument, any misrepresentation about Cahill's identification of Plaintiffs was immaterial for the same reason the misrepresentation of Murphy's statement was.

generic assailants. Perhaps a jury could find such conduct to have been knowing or reckless. However, it was immaterial.

There are two reasons the misrepresentation was immaterial. The first is that another witness—Schneider—both corroborated Murphy and Cahill's story and identified all four parties. The second is that whatever factual disputes exist regarding what happened that night, there is no dispute that the incident in the parking lot involved Plaintiffs, Murphy, and Cahill.

Regarding the first reason the misrepresentation was immaterial, the case supplement report cited interviews with two eyewitnesses, Eddy and Schneider. The report states that Schneider "stated she actually observed John strike James in his head with the bat. Virginia [Schneider] knows all parties as customers and can identify all 4 parties." Case Supplement Report and PageID.38. This was a crucial identification, and it allowed Rupkus to put names to Murphy and Cahill's unknown assailants. Had Rupkus accurately recorded that Murphy and Cahill reported being attacked by a male and female assailant that Murphy and Cahill did not identify, the report would still have provided an equivalent basis for prosecuting Plaintiffs. Either way, the fundamental question would have been whether to believe Murphy, Cahill, Eddy, and Schneider, or whether to believe Plaintiffs.

Regarding the second reason, Plaintiffs do not deny having interacted with Murphy and Cahill in the parking lot, although they emphasize that "[t]he only interaction with Murphy that Plaintiffs acknowledge relates to his grabbing Walsh's arm, dragging him through the bar's parking lot, and running over his leg." Resp. at 12–13. The case supplement report notes as much, stating, "John denies that there was a baseball bat involved and stated that the suspect James just ran him over." Case Supplement Report at PageID.39. Plaintiffs have not suggested that some other couple chased Murphy and Cahill's car with a baseball bat, or that Plaintiffs were not

10

involved in the incident in the parking lot that Murphy, Cahill, Schneider, and Eddy witnessed. Plaintiffs vigorously dispute what happened, but they readily admit to having been there. Again, one could imagine Rupkus having filed a more scrupulous report that accurately recorded that Murphy and Cahill reported being attacked by a male and female assailant whom Murphy and Cahill did not identify. But if Rupkus had filed such a report, any reader would draw the inference that Murphy and Cahill had been referring to Plaintiffs, even though they did not know who they were. Even if Murphy and Cahill were lying through their teeth about what happened, there is no dispute that it happened with Plaintiffs.

Plaintiffs confirm the immateriality of whether they were referred to by name or generically. They write, "it is not Plaintiffs' 'interacting with Murphy' that led to charges being brought against them. The critical element used to procure charging Plaintiffs' [sic] with felonious assault was the false allegation that they used a bat to strike Murphy." Resp. at 13. The latter sentence is exactly the point. Plaintiffs concede that the allegation that Plaintiffs struck Murphy with a bat indisputably was "the critical element" in causing the prosecution. Thus, Rupkus's alleged misrepresentation that Murphy and Cahill had referred specifically to Plaintiffs was immaterial.

### 2. Plaintiffs do not identify a knowingly or recklessly false statement by Rupkus associated with Plaintiffs' alleged use of a bat or with Schneider or Eddy's ability to identify the parties involved.

Plaintiffs argue that Rupkus's report contained "unreconcilable and contradictory information as to witnesses Virginia Schneider and James Eddy." Id. at 13–14. This relates both to Schneider and Eddy's statements surrounding Plaintiffs' use of a bat, and to their statements surrounding the identities of the individuals involved in the conflict in the parking lot.

11

As stated above, Plaintiffs argue that "the critical element used to procure charging Plaintiffs' with felonious assault was the false allegation that [Plaintiffs] used a bat to strike and threaten Murphy." See id. at 13. Rupkus's report notes that three witnesses—Murphy, Eddy, and Schneider—reported seeing a bat, and that Walsh denied a bat was involved. Case Supplement Report at PageID.39. Rupkus also reported that Schneider had said she "actually observed John strike James in the head with the bat, and that she knows all the parties as customers and can identify all 4 parties." Case Supplement Report at PageID.39. This statement by Schneider both specifically identifies Walsh as the bat wielder and states that the bat made contact with Murphy's head. Thus, the statement supposedly contradicts Schneider's statement to Wietecha, and Eddy's statements both to Wietecha and Rupkus—that one of the Plaintiffs (unclear which) merely swung a bat (but did not make contact). Another contradiction relied on by Plaintiffs is that Schneider initially told Wietecha that she thought the driver of the white pickup truck was named Mike, and she later told Rupkus that she could identify the driver and his passenger as Murphy and Cahill. Compare Wietecha Field Report at PageID.29, with Case Supplement Report at PageID.39.

However, Plaintiffs fail to present to any evidence that Rupkus included these statements in his report knowing them to be false or in reckless disregard for whether they were true or not. "It is absolutely clear . . . that an officer will not be deemed to have commenced a criminal proceeding against a person when the claim is predicated on the mere fact that the officer turned over to the prosecution the officer's truthful materials." Sykes, 625 F.3d at 314 (emphasis in original). And faithfully reporting what a witness says, even if what the witness has said turns out to be untrue, is not an untrue statement by the officer and is not actionable.

Nor is it actionable that an officer includes the statements of a witness who has contradicted herself or is contradicted by other witnesses. Police investigations are rife with

12

inconsistent statements and dueling versions of history. An officer cannot be hailed into court to answer in damages when his report furnishes the prosecutor with a faithful transmission of what a witness has said, even where a witness has contradicted herself or is contradicted by others—unless there is evidence that the officer knew the statement was false or recklessly disregarded whether it was false. The Sixth Circuit has explained this principle, in the analogous context of officers relying on witnesses' identifications of suspects:

> A law enforcement officer is entitled to rely on an eyewitness identification to establish adequate probable cause with which to sustain an arrest. An eyewitness identification will constitute sufficient probable cause unless, at the time of the arrest, there is an apparent reason for the officer to believe that the eyewitness was lying, did not accurately describe what he had seen, or was in some fashion mistaken regarding his recollection of the confrontation. This comports with the general notion that, since eyewitnesses' statements are based on firsthand observations, they are generally entitled to a presumption of reliability and veracity.

Ahlers v. Schebil, 188 F.3d 365, 370 (6th Cir. 1999).

Here, Plaintiffs present nothing more than an officer faithfully reporting what was reported to him—without any evidence that he knew the statements were false or recklessly disregarded whether they were.

Furthermore, Plaintiffs have failed to provide any evidence that Rupkus prevented the prosecutor from learning about the allegedly conflicting evidence or hid any evidence from him. Rupkus testified—on Plaintiffs' counsel's questioning, and without any evidence to the contrary—that the report Rupkus sent to the prosecutor included, among other documents, Rupkus's narrative, the uniformed officers' narrative, the witness statements, and the photographs. Rupkus Dep. at 74. To the extent the conflicting narratives and witness statements contained in those documents were so obvious as to undermine probable cause, the prosecutor had all the information necessary to make that judgment. While officers may not "'hide behind the officials whom they have defrauded,'" Sykes, 625 F.3d at 317 (quoting Jones v. City of Chicago, 856 F.2d 985, 994

13

(7th Cir. 1988)), there is no evidence that Rupkus prevented the prosecutor in this case from making an independent judgment about whether the evidence supported probable cause.

Thus, on the state of the record, Plaintiffs have not shown that Rupkus made, influenced, or participated in the decision to prosecute; that means they have not met the first Sykes element.[3] Therefore, summary judgment in favor of Rupkus on the malicious prosecution claim is warranted.

### E. Qualified Immunity

Rupkus invokes the doctrine of qualified immunity, which the Sixth Circuit has summarized as follows:

> Qualified immunity shields government officials performing discretionary functions from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known. In order to determine whether or not qualified immunity applies in an excessive force claim, the Court must engage in a two-step inquiry, addressing the following questions: (1) whether, considering the allegations in a light most favorable to the injured party, a constitutional right has been violated, and if so, (2) whether that right was clearly established. When evaluating the defense of qualified immunity on a motion for summary judgment, the court must adopt the plaintiff's version of the facts.

Campbell v. City of Springboro, Ohio, 700 F.3d 779, 786 (6th Cir. 2012) (punctuation modified, citation omitted). Because Plaintiffs' claims fail on the first question, the qualified immunity inquiry ends there.

### F. Remaining State Law Claims

What remain are state law claims for malicious prosecution pursuant to Michigan common law and the Michigan Constitution, intentional infliction of emotional distress, and gross negligence. Because the dismissal of the federal claims means that this case no longer retains a federal character, the Court dismisses these state law claims without prejudice and denies the

---

[3] In light of Plaintiffs' failure to satisfy the first element, the other elements of the Sykes test need not be examined.

motions challenging the state law claims without prejudice. See 28 U.S.C. § 1367(c)(3); see also Gohl v. Livonia Pub. Sch., 134 F. Supp. 3d 1066, 1069 (E.D. Mich. 2015), aff'd., 836 F.3d 672 (6th Cir. 2016).

### IV. CONCLUSION

For the reasons stated above, all claims against Clinton Township (Count II) are dismissed with prejudice. The malicious prosecution claim brought against Rupkus pursuant to Michigan Compiled Laws § 600.2907 (Count III) is also dismissed with prejudice. Rupkus is awarded summary judgment with respect to the claims brought against him under the United States Constitution (Count I). The remaining claims (Counts IV and V) are dismissed without prejudice.

SO ORDERED.

Dated: July 29, 2021  
      Detroit, Michigan

s/Mark A. Goldsmith  
MARK A. GOLDSMITH  
United States District Judge